The next case of the morning is No. 16-31190, Chester v. Arena, and what did I do with my docket sheet? Thank you. Please introduce yourself to the Court. Yes, Your Honor. My name is Sarah Kalis, attorney for plaintiff appellate Chester. May it please the Court. Again, I'm Sarah Kalis. This case is unique in that it provides the Court with an opportunity to speak for the Fifth Circuit in an area which other circuits have already laid precedent. We are essentially inviting the Fifth Circuit to join the others here. Here we believe that the trial court incorrectly ruled on appellee's motion for summary judgment and simply ask that this Court remand this case back to the trial court with some instruction so that the parties have a full opportunity to conduct discovery and basically move from there. The prongs for approving a prima facie case under 42 U.S.C. 1981 and 1982 are very similar, albeit the first prong is actually the exact same. This prong is the one that appellees take the most issue with and the one that we feel that the trial court really misinterpreted, that really it rooted its decision on. They decided on this factor so quickly, the fact that they basically based their whole much so that it didn't even go on to review the other factors that were in question. Since this prong is the one that we feel the trial court's decision most hinged on, it's the one that I'm going to focus the most on during the majority of my argument. I will briefly touch upon the association factor that the Court spoke upon and then again I'll run prong two a little bit. The first factor being for 1981 and 1982 is that plaintiff is a member of the racial minority. Appellees argue that because plaintiff is not a member of a racial minority and instead is a Caucasian woman, she doesn't have a claim under 1981 and 1982. Normally that would be very cut and dry. However, in our brief we cited various cases in the Fifth Circuit and in other circuits which held that Caucasians or people that are not of a racial minority have a claim under 1981 and 1982 after they've been discriminated against due to their association with non-white racial minorities. For example, in the Ali Zaha case and the Faraka cases, they both involved discrimination against a white plaintiff who had a spouse who was non-white. The Winston case, also another case that both we and the trial court paid attention to, shows that an employee had a claim when he was discriminated against, though he's white, after defending an African-American coworker. In those cases, the court found that nevertheless, a white plaintiff had a cause of action under 1981, thus defeating the first factor. Now, appellees and the trial court held that these cases don't apply because they overlap with Title VII and have to do with employment discrimination context. However, nonetheless, it's our position that those in cases are still instructive here, and this court has the ability to lay precedent, and we see no reason why there Moreover, appellants cited cases that were non-employment discrimination related in our brief. For example, the Des Ferenas case, the First Circuit specifically discusses the federal history of 1981 and 1982, and explicitly states, I'm going to quote, to invoke 1981 and 1982, one not need to be a member of a racial class protected by the statute, and one not even need to be able to identify any specific member of the class who suffered or may suffer discrimination. Similarly, in the Evans-McKay case, the Ninth Circuit said that 1981 prohibits private racial discrimination against white persons as well as non-whites. These are both non-employment cases, Your Honors. Again, if we're going to go back to the employment, however, the Supreme case, the Supreme Court But it's very unusual to have a white person claiming that another white person is discriminating. There aren't many of those cases, either. There aren't. But it's more so that we're looking at the relationship between our client and her clientele, which we said are 30 to 40%, which frequent the commercial space that she rented from defendant. And we're looking at the relationship between her and she was discriminated against based on that association, which isn't as few, but I agree that there are a few cases. Didn't the district court also hold that even if there were a cognizable, the possibility of a claim under 1981 or 82, that you just didn't prove that there was a material fact issue that he was, this termination was racially motivated? Right. So that is kind of what I wanted to go to. So we filed our opposition, the motion of summary judgment before the discovery responses that we had sent over were due. The discovery that we later received back shows that there is a dispute of material fact specifically to whether or not there was an intent to discriminate. There is basically stark contradictions between Apelli's brief and the discovery responses. Just tell me what your theory of the case is here. I mean, what, in other words, she put the sign out that on its face would encourage being tolerant toward all races and so forth. So what is your theory of the case? Essentially it's our theory that Mr. Arena, the Apelli, essentially once this happened, once Ms. Chester showed her anti-racism beliefs and her support for the African American community, that was when he decided, oh, I don't want you here. He asked her to sign a written lease. This is something that he said was in the ordinary course of business. It's important to note that Ms. Chester has been a tenant for multiple years beforehand. She was never asked to sign a written lease. Specifically if we're going to look to those discovery responses, we asked them to produce any written leases. They produced two written leases, both of which were signed specifically on August 1, 2016, the date that this complaint was filed. Were there other black tenants in the building? It's our position that, and to Ms. Chester's knowledge and belief, there were none. They contest that there was, again, another disputed material fact. How can that be a disputed fact? Because your plaintiff can't testify from personal knowledge, can she? I believe that she could. She's been a tenant there for years. Well, leases are leases, though. I mean, it's a smaller commercial space. It's not like I would think that someone who is frequent in the business who is there consistently because that's where she runs her practice at. I mean, give me some sense of the building. What size is it and how many tenants? I'm not particularly sure, but I know it's under, I would say it's under 50 tenants. I mean, how many people occupy the building, do you think? I'm not particularly sure. What kind of businesses are in there? I believe it's just, so she just ran her social work business out of there, so I'm assuming that it's just a building with a couple commercial spaces where they run different kinds of businesses out of. So why didn't you do some discovery? Why did we do some discovery? Why didn't you do some more discovery? We didn't have an opportunity to because the motion for summary judgment was filed and then granted. Did you ask for time to discover? So we received discovery responses back, but it was before our opposition was due. They had their reply and all of a sudden the trial court issued its decision. We didn't have an opportunity to do any more. We're right now asking for a decision to do more discovery. We believe that there are still material issues that need to be dealt into and need to flesh out before we do that. I thought there was oral argument on this motion. Pardon? I thought there was oral argument before the court on this motion. No, ma'am. So why didn't, I mean, didn't you, I also forget though, was, did you make a motion for further discovery? We did not. Okay. And did you, did your plaintiff directly contradict what Mr. Arena said, which was that he was afraid that the, that minorities would be offended by that? She did. So we submitted also an affidavit on her behalf, which they contest is, contains more hearsay, but instead it's a party admission at this point. But specifically she contradicts steps that are things that were actually also Mr. Arena put in his affidavit. So we just have more further contradictions. She essentially did say, this is not why, you know, this is just an excuse. Like this, this is not why he wanted me to take this matter. It doesn't matter particularly what she said, but what his reaction was since you're trying to say that he was acting in a racially discriminatory manner. We feel that that's just a cover-up at this point. Well, I know what you feel, but what is the evidence? We think that the evidence, that there's a discriminatory intent in the actions that he portrayed, that he immediately asked her to sign a lease and get all this insurance, which no other tenants had to our belief, that she had never been asked to before, as soon as she shows this controversial signage. We show that that shows the discriminatory intent and that there's circumstantial evidence to show that. Also, there's his statements again, which we're going to, they're going to say is hearsay that we put in an affidavit. We think that coupled with all this, this all put together essentially shows that there is a discriminatory. Well, controversial doesn't necessarily mean racist though, does it? Right. I'm not saying it was racist. I'm trying to say that. Right under 1981, so therefore, well, you just use the word controversial. I'm saying that the sign was controversial, pardon me. The sign was controversial and because it was showing support for the African American community and support for equality, that in effect, when he asked, please take that down and made disparaging comments. And it said e-racism and then did it have one of those signs through it or something? I mean, again, you know, the sign usually means abolish. Right. E-racism, that's, I mean, even grammatically, if you can call that kind of sign grammatically, it's somewhat ambiguous. If it had been a sign and it said racism, that's like, I hate, you know, like stop jaywalking or something because the sign means negative. I understand. So, you know, since your sign is a double negative. I think, I understand. More so, I think. I mean, isn't that possible? It's possible, but I don't, I'm, first of all, I'm not clear if that's exactly the sign. I think that you might be confusing that with the, there was another sign that was a confederate flag and, and, but also to point out in Appelli's brief, they say, you know, Mr. Arena was concerned because he had other African-American tenants and they might think that this meant that he didn't support them or something like that. And that doesn't even make any sense at this point. Well, a lot of this case, frankly, doesn't make a lot of sense. Because it's a real, as you say, it's unique. It's unique. It's convoluted. And again, that shows that we need to go back and do some more discovery because clearly a lot of the facts aren't fleshed out. But you know, I mean, our role is to see whether the district court made a mistake. And if you didn't move for discovery, how do we say he made a mistake in not allowing it? I mean, I think that, I don't know why we didn't move for discovery further. I think that once we just had the trial court had handed down its decision, we didn't have an opportunity to do anything else at that point. And we felt that we'll just take it to the appellate court. I'm also just going to briefly touch, unless y'all have other questions, but I was going to briefly touch upon the association portion of the trial court's opinion in which they essentially said that the level of association between plaintiff's clientele and herself, that level doesn't really rise to this burden of discrimination that saying that because these employment cases don't apply because this relationship between an employer or an employee or an employee and a coworker, that's, the trial court basically said that those were more intimate relationships. We kind of failed to see how that makes sense. As I said, Ms. Chester is a clinical social worker. This is a profession that requires a high degree of confidentiality, privilege between her and her clients. This is even a privilege that courts have given the same deference as between a husband and a wife. So this is not just a seat. I understand your point here. It seems to me that there's very little evidence in this case. You don't need much. You need something. But you need to show some discriminatory purpose on the part of Mr. Arena. You have the two signs, I think, to the degree there are two signs of racism on the Confederate flag with the line through it. Mr. Arena says, I'm concerned that this will be misread and either people in the neighborhood or other tenants will think that, in fact, this is in favor of the Confederate flag or in favor of racism. Say something derogatory about African-Americans being able to understand what these signs mean. Okay. So you got that. Is that enough to say that you have a 1981 case? I think I agree with Judge Davis that we will have to reflect on all this before anything is final. But at this point, I agree with Judge Davis that there's no issue here of needing more discovery because you didn't ask for it. So is that enough to get past summary judgment when you have basically you're unable to dispute what Mr. Arena is saying, that he was concerned about the danger to my overall buildings if people misread these signs? Just what would you point us to as really supporting that you have something to overcome at this stage, which is all the evidence that was available at that time that you asked for, that you have proven enough to create a dispute of material fact? Well, so that's my issue, Judge. It's the problem that we didn't have that opportunity to get more discovery. I understand that we should have asked for it at that point, but all we had are these very meek discovery responses. And the fact that those discovery responses in themselves basically lend to the fact that there is more information out there, for instance, in possible witnesses. They had listed all these people that are a part of the Warriors Against Racism group, which Ms. Chester founded. That doesn't really make any sense to us. That kind of shows, you know, what's going on here? Why are these people that are anti-racism would be in support of this? We're not really sure what's going on. She is a prominent member in the St. Bernard Parish for her social equality, all this stuff. And we think that there's more to be seen. And that's why we have to be remanded to the trial court for more discovery. Okay. Thank you. You have time for rebuttal. Thank you. Good morning. May it please the Court. Matthew Meng here on behalf of defendants on the penalties, Mr. Frank Arena and Franklin Square Rentals. Your Honor, Judge Amell properly ruled at the district court as a matter of law that under Sections 1981 or 1982 in that she is not a member of a racial minority under the first element. There's no debate here or controversy that Ms. Chester is not a non-minority. She's a non-employee Caucasian woman bringing suit for racial discrimination against a non-minority non-employer Caucasian man. She's not a member of any racial minority. She does not allege to have been discriminated against by a non-Caucasian majority. And her claims do not fall within some of the limited exceptions for a cause of action for a non-minority, that being a retaliatory discharge by an employer due to her efforts to vindicate the discriminatory actions being taken against another minority employee. And she did not suffer any vicarious effects due to any employer's discrimination against a minority fellow employee. In that regard, Judge Amell correctly found that the employment cases which Ms. Chester almost 100% relied upon for her cause of action were irrelevant and an opposite. Again, those cases involve scenarios wherein a non-minority plaintiff was either discharged directly because of her efforts to vindicate a minority worker's rights or suffered the vicarious effects of direct racial discrimination directed from the employer against a minority. The key component in these cases is that there is always a minority individual who is being discriminated against on the basis of race. That — there's no dispute that factual scenario is not present in this matter. There are no minorities at issue, no racial discrimination, whether intent or indirectly directed towards any minority individuals. In those cases — JUSTICE KENNEDY Mr. Manning, I think we got there. We got that some cases seem to focus on that and the plaintiff is not a minority. There are cases dealing with associational rights. The McDonald Supreme Court case from 1976 says actually 1981 protects both blacks and whites, whatever to make of that. Can you deal with some of the associational cases that the plaintiff is raising and that we'll have to deal with? MR. MANNING Absolutely, Your Honor. The non-employment cases also don't support any cause of action for Ms. Chester. The clearest distinction we can make from some of these few cases that the plaintiff cites, each and every case, again, involved a minority and a plaintiff who suffered damages from discrimination directed — directly or indirectly towards a racial minority. Again, none of that is present in this case. There's no racial minority involved in this case. There's no racial discrimination being directed, whether inadvertently, directly, what have you, against any racial minority. And again, there's no injury to Ms. Chester in this case. She wasn't evicted. She left the property annexedly. But discussing some of those cases, in addition to that distinction, they're distinguishable from many other factors. If you take the Davernes v. Seekonk Water District case, that's a case — it's a city water service district specifically refusing water services to a construction site because it would attract African Americans. No debate that there are minorities being discriminated against on that basis, and the corporation was affected because they couldn't build the construction site due to direct racial discrimination against the African American community. Mr. Manning, here what we have is something somewhat related, not construction, but a different kind of business. And she's saying, you know, this is early in the case, but on summary judgment is saying that 30 percent, 40 percent, whatever it is, you know the record better than I do, of my clients are minorities. Maybe she specifically says African Americans. So this will close down this business, keep African Americans coming from this area. That's not all that much different, is it, from — what is the distinction? You would tell me from what you just described about the construction site. Well, again, in the construction site case, there's no question in that case that the water service specifically admittedly refused to offer services to the African American community. There's no admission here, but there is an allegation supported by some — maybe we'll have to decide — some circumstantial evidence. Other than the affidavit where Ms. Chester says that approximately 30 percent of her clientele are African American, there's no other evidence. All she did was place a sign on her leased property. As the Court said, quote, merely posting signs on a property is not enough. That's coming from Judge O'Mell and his rulings. Her alleged African American clientele, if they exist, didn't ask her to place that sign. She doesn't claim any other specific affiliation with African Americans. She doesn't claim any impact of Ms. Serena's actions on her affiliation with African Americans or any other minority or the businesses. So I think those are important. What do you mean by that last thing? I mean, if she closes the business down and has to move, that has an impact on the business and the clients that it serves. Well, she's still working. She just moved to another property, as I understand it. And again, she wasn't evicted. She was asked to sign a lease. She refused to sign the lease. And under Louisiana law, which Judge O'Mell didn't need to get to in his ruling, that's a proper — he gave notice of an eviction for her not signing a lease and getting insurance on the property, which every other tenant, Mr. Arena and his company have throughout St. Bernard Parish, commercial, residential, what have you, sign and get insurance. I'm not sure about that, because I thought I heard an earlier argument that at least this tenant had never been asked to sign a lease. And I thought your opposing counsel was indicating other tenants in this business had not — in this building had not signed a lease. Is that part of the record? Well, that's — it's not true. Every other — No, is there anything in the record to support that? No. Counsel's statement, no. And that's — You know, my understanding of the plaintiff's theory of the case is the plaintiff posted this sign that was going to encourage more black people coming to his building. And for whatever reason, the defendant didn't want that. And so why does that not fit in the association cases? I understand that's the argument of counsel. Argument of counsel is not evidence. No, no, no, no. That theory of the case, why does — if they could prove that up, why would that not fit within the association cases? It doesn't fit, because none of the association cases involve that factual scenario. They all involve discrimination directed against a minority, which is not present here. I'm hesitant to jump into the next — Yeah, suppose the other side of it. Suppose she had put up a poster. Suppose she were — well, she's white. Suppose she put up a poster with the Confederate flag and Mr. Arena had taken exactly the same actions. It would make no difference whatsoever. And I'm hesitant to jump into the — It's not about race. It's about protecting the integrity of the property. That's correct. And if you look at the sum total of evidence presented, if you want to call it evidence at the — at the summary judgment stage, the only evidence other than argument of counsel is that — that alleged quote that Mr. Arena made. And we've stipulated on the record that quote is not true. Mr. Arena never said black people can't read, which was the quote. But even if you take that quote — Are you imposing counsel stipulated? I mean, we made that statement on the record. It's contested. It's contested, sorry. But that's not — even if we assume arguendo that that quote is true — I'm sorry, Your Honor. On summary judgment, we read all the evidence in the light most favorable to the opponent of summary judgment. And let's do that and assume that that quote is true. The quote, if you read the whole quote, plaintiff admits in her own recapitulation of what Mr. Arena told her is that he was concerned about people destroying the property because of this controversial sign. The Court indicated — This was at a very difficult — this was about a year and a half ago, right? Yes, around the same time — On Missouri and — Around the same time that other riding, racial riding was happening in Baltimore, other events were happening at the time. So even if we assume in the light most favorable to the plaintiff that her quote, Ms. Arena, is correct at face value, that supports a legitimate reason for having her sign a lease and get insurance on the property. There's no discriminatory intent. There's no race involved in that whatsoever. That is a huge distinguishing fact that would necessitate or dictate a summary judgment motion if this case were to proceed and we had to file the next motion for — to prove a legitimate non-discriminatory purpose. So I don't want to jump ahead into that, but in answer to your question, Judge, if we assume that quote is at face value, we still — Judge Amell's ruling is still correct. If we look at other non-employment association cases, the Woods v. Drake — Woods-Drake-Lundy case, this is a case where a lessor directly told the tenants, one of whom was a minority, a Mexican-American, that he would not allow African-American tenants on the property. That is completely distinguishable from this matter. That case actually went to trial. The lessor didn't testify or present any evidence on — in his own defense, and that's why the court found a willful intent to discriminate directly on the basis of race. That is not at issue here. And again, no eviction ever occurred in this case. Mr. — as in the — as in the Drake case where the tenant threatened to evict if minority guests were on the property, Mr. Arena didn't ask — ask or forbid any minorities on the property or anything like that, which is distinguishable. If you look at the case where I think the quote on the cause of action for association comes in, this Holman v. City of Reading case, that's a Pennsylvania district court case, that case cited cases in support of the association claim involving Section 1983 employment retaliatory discharge cases, which are distinguishable, 1985, and Title VII gender discrimination cases, which are just not applicable to this case. Ms. Chester also cannot satisfy the second element of a cause of action under 1981 or 1982, which is the intent to discriminate on the basis of race. We looked through all of the filings at the summary judgment stage in the trial court. The word intent didn't appear anywhere in either Ms. Chester's complaint or her affidavit for summary judgment. The only use of the word intent was from the arguments, the conclusory unsupported arguments of her counsel. It's axiomatic. As the Court is aware, the argument of counsel without any support, summary judgment evidentiary support, is not evidence. JUSTICE KENNEDY Counsel, what evidence is there usually? I'm asking to survey your mind quickly what the cases say. Let's take this case. What evidence of intent would there be other than circumstantial evidence? Are you saying that unless Mr. Arena admitted in some fairly clear fashion that I want to run off black people that there's no evidence? Can't we take the circumstances of what happened as a basis to infer, a fact finder  MR. CHESTER No, Your Honor. I don't think we can even get to that point. There's no evidence. There's no circumstantial evidence. JUSTICE KENNEDY I'm taking that as a legal concept. I'm sure I didn't ask it that way. But isn't that generally how or often how intent would be shown? So it seems to me your argument really is there's no such evidence in this case. But you wouldn't usually have an admission or not often have an admission from a defendant that this is the reason I've done all this. JUSTICE GINSBURG I mean, your association cases that you've been citing have all been ones where there was a direct threat that if you associate, in other words, this is a crime of speech by necessity, association, right? MR. CHESTER I think that's a fair way to look at it. And in those cases, you have the threat against a non-minority . . . JUSTICE GINSBURG These are not . . . those are not inferential cases.  CHESTER Those would not be inferential, I suppose, Your Honor. And in this case, the only summary judgment evidence that was presented to prove intent was that quote that we were discussing earlier. JUSTICE GINSBURG That's what I'm saying. The only . . . again, I'm not saying that you could never infer, but you have . . . but the nature of an association claim is I don't like who you're associating with. And you do that if it's not in the employment context where you have other things at play, I suppose. The only way you can do that is by your saying something. MR. CHESTER That's correct. And I don't think we have any evidence of that, even circumstantial evidence, to prove a racial discriminatory intent in this case. He asked her to sign a lease, which she refused to do. That's it. He didn't ask . . . the sign would be intolerant toward other races, which could be construed to mean I invite more blacks into my office and into this building. And if that's the reason he refused to renew her lease, why does that not give some indication of discrimination? MR. CHESTER If we assume that the controversial signage couldn't be interpreted, it's a Confederate flag with a slash in it. Let's assume it wasn't that, as Your Honor was saying. JUSTICE KENNEDY Well, say it could. Say that's one interpretation of it. MR. CHESTER Yeah, exactly. There's no discriminatory intent that can be proven or shown circumstantial or otherwise by a lessor being concerned that a sign could invoke violence on his property. And that is the reason, even if the plaintiff concedes . . . JUSTICE KENNEDY That's the reason he gives. MR. CHESTER That's the reason he gives. And the plaintiff's quote, which is the sum total of evidentiary support for this, which is hearsay and can't be considered under the Garcia case anyway, but let's just assume it would be admissible in these proceedings, the quote admits that Mr. Arena was concerned about, I think he used the term, somebody's going to bomb my building, cause damage to the building. So the very quote which the plaintiff concedes is what they are using to prove circumstantially, inferentially intent, supports a legitimate nondiscriminatory reason. And on that basis . . . JUSTICE SOTOMAYOR I mean, can they allege anything in . . . I mean, can you really say there's a genuine issue of fact if the fact is that 30 percent of her clientele are African-American and she's been there for years? Can suddenly something that has been okay for years be transformed into racial intent? That just, you know, I think I agree with Judge LaMelle on that. JUSTICE KENNEDY We agree as well, Your Honor. We agree as well. JUSTICE KENNEDY The panel will have to decide for itself, though. JUSTICE KENNEDY Let me just ask you this. Let's say you have a building owner and a black comes to rent an apartment from him and he says, no, I'm afraid if I rent you this apartment, it's going to create all kinds of problems and somebody's going to firebomb my apartment house. Would that be actionable? JUSTICE SOTOMAYOR I'm not sure it could be, Your Honor. I think it's very different from . . . I think in the hypothetical you just raised, the landlord is saying I'm concerned about actions . . . I'm concerned about minorities for no other reason than them being minorities here. That's not the case. He didn't even ask . . . Ms. Serena didn't even ask Ms. Chester to remove the sign. All he said was sign a lease. He didn't say, please don't bring African-Americans on the property. There are other African-American tenants. One of his tenants, which I believe was right next door or close by to Ms. Chester's unit, was the wife of a local rapper by the name of Juvenile. So there are certainly African-American tenants in the building. And I don't think our facts come anywhere close to that hypothetic. But to answer your question, under that hypothetic, possibly, Your Honor, but those facts aren't present here. Unless there are any other questions from the court, I suppose I would close. I would just say Mr. Arena and his family are in the courthouse today. They have been citizens, business leaders, members of the St. Bernard Parish community for thirty years and more, many, many decades. They've taken great personal offense to being accused of racially motivated actions in this case. They've taken great interest in defending their interests and their legitimate business reasons in this case, which is another reason why they're here today. There isn't a scintilla of evidence in the record to suggest or even remotely infer that Mr. Arena discriminated against Ms. Chester on the basis of race or on the basis of any alleged association that she had with minorities. All Mr. Arena did in this case was ask Ms. Chester to sign a lease and to get insurance on the property, as all of his tenants, including his many African-American tenants did, as a fundamental, legitimate matter of business as a landlord. Ms. Chester's claims have no merit, and we would ask the court respectfully to affirm Judge Moe's ruling in that regard. And I think the court . . . Let me ask you to respond to something your friend on the other side was not able to answer. Can you describe this building and give us an idea of what kind of businesses are there? It's a commercial building. All of the businesses . . . it's a commercial building adjacent to a storage unit. So the storage unit is part of the complex. Obviously, that's tenants storing various items, personal or otherwise, in there. And then we have these commercial units, one of which was Ms. Chester's unit. Commercial as in . . . Businesses. . . . some people walking by, go in to different doors? It's a strip mall type of commercial establishment, if I can say that, Your Honor, with different businesses of all shapes and sizes, all minorities, non-minorities. Do you know how many businesses or at least how many spots there would be for businesses? There's at least eight to ten other tenants in that building. There are perhaps more, Your Honor. I'm sorry. I don't have that exact figure. Thank you. I thank the court. Ms. Califf? Thank you. Thank you. Just briefly. First of all, just to touch upon something that opposing counsel had said. So when Mr. Arena asked Ms. Chester to . . . about this sign, first of all, he did ask her to take it down. Again, another disputed fact. Second of all, what he asked, his specific request was, one, I would like you to sign a written lease, which he had never asked before or of other tenants, to our belief, and with the evidence that is in the record, if we can call it that. Two, he asked that she retain $500,000 of insurance, which she actually ended up getting a million dollars of insurance. So she complied with that request. But she didn't make him the co-payor. She didn't. Correct. She got it, so she apparently felt it was worthwhile for herself. Well, I mean, if he's going to say that he was so concerned that this building needed to be insured because this is going to happen because of the signage, which she then proceeded to take down, she complied with that. She said that she would sign a written lease. She just didn't. She refused. He wanted to be also be able to pre-approve all signage that would be posted in the future. She also would not comply with that, which is why she didn't sign the written lease. Well, it seems to me one of the most significant things about it, and tell me if it's undisputed, is that Mr. Arena was our business, wasn't named as a co-insurer. Correct. He was not named as a co-insurer, and he was concerned about that. I think that it's just really important to highlight to the Court that the purpose of the statutes in the employment context serve as a fundamental recognition that certain people in certain classes should be protected and should not be discriminated against. Discrimination is so frowned upon, no matter the context, it shouldn't be a matter that we're looking at an employment context or a rental landlord context. It's public policy that, behind this, that we should simply prohibit and eliminate discrimination. I know that we're going to go back to this intent factor. What do you think? Yeah, let's go back to the intent factor. I mean, obviously, we think that intent is implied by the circumstantial evidence, and as we did look at it, Judge Southwick said . . . I mean, just explain to me, in human nature, where is the malevolent and the racial intent to discriminate, where she's been at that business for years, a large number of her clientele are African American, and everything was fine? Everything was fine until she started posting . . . I understand that, but if the man was somehow offended about African Americans, he could have turned . . . you know, the lease has a term. He could have refused to renew it years before, right? Correct. Well, the next time that she did try to pay rent, he did refuse it. He refused to take the rent. Well, that was because she didn't comply . . . That's it, correct. It's correct, Your Honor. It seems to me most landlords have a right to expect a written lease. I think that what lends most to the intent is, first of all, it's our belief that there are no other minority tenants in the building, especially now that we're saying that there was eight to ten. You would think that someone who has been there for years would know if there were other African American tenants, and she said in her affidavit that she did not know any others. Who's the wife of the rapper? I don't know, and we didn't specify her race either. She doesn't know either. I would assume that she's white, since my client has said that she knew that there was no other African American tenants. Well, then she's discriminating if she thinks that another white tenant can't have a black husband, right? No, I wouldn't say that, Your Honor. I'm just saying . . . Well, that just shows how slippery all this is. Anything can be . . . I mean, what we say from the bench can be considered racism, gosh knows. That's right. So, I'm saying that these three things that basically hinge on this intent is that, one, that we believe that there are no other African American tenants. Two, he asked her to take this sign down as a landlord. I understand that. Also, there are no other written leases until this time. Until she showed her support, there was no problem. Exactly what you're saying, Your Honor. We went years and years with 30 to 40 percent of African American clientele coming in and out. There was no issue until this exact moment when she basically purported and showed her support for the African American community. Well, when she was showing her support all through the years, you need something to take us beyond mere speculation. It seems to me, taking the evidence in front of the Court at that time on summary judgment, what you had is what a landlord might think would be provocative in a time of great unrest and destruction of property in some places. It seems to me that's the only new ingredient here, not the signs per se, but that the signs might be inviting not blacks to come, they're already coming, but anger or destruction. And it's a difficult case. I'm not saying you have nothing, but it isn't—we'll just have to decide whether you have enough. I think it just kind of brought to light the two feelings of both parties. I think that it made it more obvious and, you know, maybe—I don't know as a landlord—I mean, I know that he was close by, but maybe he wasn't completely aware of her beliefs in that aspect. And once this came to light, that was when things changed. That's when a lease needed to be signed, unless y'all have anything else. All right. Thank you. Thank you. We'll call the last case of the morning.